[Cite as *Alomari v. Almajali*, 2020-Ohio-4349.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| HAKAM ALOMARI, | : | |
| Appellant, | : | CASE NO. CA2019-11-187 |
| | : | O P I N I O N |
| - vs - | | 9/8/2020 |
| | : | |
| ABRAR ALMAJALI, | : | |
| Appellee. | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. DV2019-01-0051

The Quraishi Law Office, LLC, Nadeem Quraishi, 4938A Wunnenberg Way, West Chester, Ohio 45069, for appellant

Suzanne Firestone, Legal Aid Society, 215 East Ninth St., Suite 500, Cincinnati, Ohio 45202, for appellee

**S. POWELL, J.**

{¶ 1} Appellant, Hakam Alomari ("Father"), appeals from the decision of the Butler County Court of Common Pleas, Domestic Relations Division, denying his petition for a domestic violence civil protection order ("DVCPO") against appellee, Abrar Almajali ("Mother"). Father also appeals from the domestic relations court's decision granting

Mother's petition for a DVCPO against Father, as well as the domestic relations court's decision denying Father's motion for findings of fact and conclusions of law. For the reasons outlined below, we affirm.

**The Parties**

{¶ 2} On December 20, 2017, Father and Mother were married in the country of Jordan. Father and Mother are both native Jordanians and parents of two minor children, twins born on September 14, 2018. Father and Mother moved from Jordan to the United States on January 18, 2018 where they took up residence in Oxford, Butler County, Ohio.[1] Father is a full-time associate professor at a local university, whereas Mother worked, and is presumably still working, as a stay-at-home mother taking care of the parties' two children. Although Arabic is Father's native language, the record indicates that Father is able to understand and communicate effectively in English. Mother, however, is not. Mother was therefore provided with an English-to-Arabic interpreter throughout these proceedings.

**Father's and Mother's Reciprocal DVCPO Petitions**

{¶ 3} On January 24, 2019, Father filed a petition for a DVCPO against Mother. Father sought relief on his own behalf, as well as on the behalf of their children. In support of his petition, Father alleged that Mother had fled from their home with the children on the evening of January 18, 2019 while he was at work by "throwing the children outside of a bedroom window" and into the snow without the "appropriate clothes for the weather." Father alleged that Mother then called him the next day and threatened "to have her family hurt [him]." Father also alleged that during that call Mother said "let them die" when he asked why the children were crying.

---

1. The record indicates Father first came to the United States to complete his doctorate degree at Kent State University in 2008.

{¶ 4}   Father further alleged that Mother, who he believed was suffering from postpartum depression, had developed "big inside anger" that led Mother to act out by "breaking objects" and "shaking the kids when they are crying."  This, according to Father, caused him to fear Mother would "do something bad with herself and the kids."  After holding a hearing on the matter, the domestic relations court granted Father an ex parte DVCPO against Mother.  There is no dispute that this ex parte order temporarily allocated parental rights and responsibilities of the children to Father.  The domestic relations court designated this Case No. DV2019010051.

{¶ 5}   On January 31, 2019, Mother filed a petition for a DVCPO against Father.  Just as Father did in his DVCPO petition, Mother sought relief for herself, as well as the two children.   In support of her petition, Mother alleged that Father had been "physically, emotionally, and financially" abusive towards her, including allegations that Father yelled at her, pushed her, beat her, hit her, burned her, and "busted" out her front teeth, "among other physically abusive things."

{¶ 6}   Mother also alleged that Father was "very suspicious" and "paranoid," that he was "[a]lways concerned with [her] whereabouts and actions," and that he "controls everything" that she does.  Mother further alleged that she was afraid of Father and feared that Father would take the children "send [her] back to Jordan without them."  After holding a hearing on the matter, the domestic relations court granted Mother an ex parte DVCPO against Father.  The record indicates that this ex parte order named Mother, and Mother alone, as the person protected by the DVCPO.  The domestic relations court designated this Case No. DV2019010065.

**Day 1: February 1, 2019 Hearing**

{¶ 7}   On February 1, 2019, the parties appeared before a domestic relations court magistrate for the first day of what became a four-day hearing on Father's and Mother's

reciprocal DVCPO petitions. The magistrate initially heard testimony in support of Father's petition for a DVCPO against Mother in Case No. DV2019010051. The following is a summary of the testimony and evidence Father offered in support of his DVCPO petition during this hearing.

Father's Testimony and Evidence in Case No. DV2019010051

{¶ 8}   Father testified that he left the house at 5:50 p.m. on January 18, 2019 to go to his office to teach his 6:00 p.m. online lecture. Father testified that his mother ("Grandmother"), who had been living in Dayton with his brother Abdalla ("Brother"), was at that time visiting him at the couple's home in Oxford. Father testified that as he left for work that everything seemed normal. However, approximately 30 minutes later, Father testified that he received a call from Grandmother who notified him that Mother and the children were not home and that they had been kidnapped. As Father testified:

> [M]y mother called me and she said – okay – "I went to the – to her bedroom to invite her for dinner. I found the window open, there is no kids, there's no wife. Someone kidnapped your wife and kids."

{¶ 9}   Father testified that after getting off the phone with Grandmother that he stopped his lecture, went home, and contacted a police officer who lived in his neighborhood. Father testified that he then called the Oxford Police Department to report that Mother and the children were missing. Father testified that he then walked around the house and discovered an open window where he believed Mother had exited with the children. Father testified that he did not know why Mother "left from the window" and found it "strange" given the fact that they have "four doors for the house." Father testified that he then tried to call Mother, but that Mother did not answer her phone.

{¶ 10}  Father testified that Mother then called him the next day and told him that she needed the children's passports. Father testified that Mother also told him, "If you are not

going to [get the passport for the kids], you are going to lose your job, and I'm going to claim a domestic violence against you." Father testified that Mother then "threatened" him and claimed that her family was "coming for [him] from Jordan." Father further testified that Mother told him that she "wish[ed] them dead" when he asked Mother why the children were crying. Upon hearing this, Father testified that he "pleased" Mother and told her, "'I will get the passports for the kids. I will do whatever you want. Do not hurt the kids.'"

{¶ 11} Similar to his allegations contained within his DVCPO petition, Father testified that he believed Mother was suffering from postpartum depression because she was "always angry" and "nervous" about the children. This, according to Father, included times where Mother would "shout to them like, 'Silent, do not cry,'" as well as one instance where Father testified that he came back from work and saw Mother "shaking" one of the children and "shouting on her." Father testified that he had also heard Mother tell the children, "Kiss my hand so I can feed you. I'm not going to feed you until you kiss my hand."

{¶ 12} When asked if he was afraid for the children's safety when they were in Mother's care, Father testified, "Absolutely." Father also testified that he did not believe that Mother would be able to care for the children on "a long-term basis" because "[he] was washing them, [he] was feeding them with her." Father further testified that he had to "teach" Mother "how to do everything" because she is "not aware of what's happening." Father additionally testified that he was afraid Mother would flee from the United States with the children. However, despite these alleged fears, Father testified that he never called the police to report any of his concerns regarding Mother prior to her fleeing from their home with the children.

{¶ 13} Sergeant Adam Price with the Oxford Police Department then testified. Sergeant Price testified that he was dispatched to the area around the parties' home to investigate a reported dispute. Sergeant Price testified that he was dispatched to several

different addresses because the caller, later identified as Mother, was "upset" and "hiding in someone's backyard because she didn't want [Father] to find her * * *." Sergeant Price testified that Mother eventually came out and flagged him down as he was driving down the street. Sergeant Price testified that Mother, who was at that time accompanied by two small children, was "very upset," "worried," "scared," and not dressed appropriately to be outside in the cold, snowy weather.

{¶ 14} Although Sergeant Price did not observe any bruising or marks on Mother that evening, Sergeant Price did testify that Mother told him Father had hit her and that she "wanted to go to a safe place, she just kept saying, 'safe place.'" Sergeant Price also testified that Mother told him "she had one hour because [Father] was gone for one hour, so she was trying to get away in that one hour." Following this initial contact, Sergeant Price testified that he took Mother and the children back to the police station so that they could get warm. Once there, Sergeant Price testified that he continued to speak with Mother and ultimately concluded that Mother "felt scared enough" that she "left through a window with her kids so that her mother-in-law wouldn't see them leaving." Sergeant Price, however, testified that there had been no follow-up investigation into Mother's allegations against Father nor any determination as to whether Father would be charged a crime.

{¶ 15} Sergeant Price later testified on cross-examination and identified three exhibits, Exhibits 2, 3, and 4, as three police reports either he or other officers with the Oxford Police Department had generated regarding their interactions with Father and Mother. This includes Exhibit 2, a police report drafted by Officers Jon Varley and Jeffry Campbell dated January 21, 2019. This report notes that Father had gone to the police station to make a report that Mother was "harassing him" and threating him that she would "leave the country" with the children and "have him harmed." The police report also noted that Father had "spoke with an attorney" and was "asking for this to be documented."

{¶ 16} Brother then testified. Brother testified that he had observed several instances that had caused him concern regarding Mother and the children. This includes one instance where Brother testified that he had witnessed Mother "screaming" at the children "in the madness way." Brother testified that upon seeing this he asked Mother, "What's going on with the kids," to which Brother claimed Mother replied, "This is not your business. I will try to keep them crying." Brother testified that he then said to Mother, "Maybe they are hungry or something." Brother testified that Mother responded and said, "If the kids need to – to milk or something, they need to kiss my hands[.]"

{¶ 17} Brother then testified regarding another instance where he claimed to have witnessed Mother sitting outside smoking while the children were inside crying. Brother testified that he told Mother that "this is not appropriate way to treat these kids," to which Brother alleged that Mother again said, "This is not your business." Thereafter, when asked if he had ever seen Mother holding the children and comforting them, Brother testified, "No." Brother instead testified that, "When they are crying or something, she put the kids in the two seats. If she want to feed them, she put the bottle in his mouth – her mouth, and that's it." Father then rested, subject to cross-examination of Mother and presentation of rebuttal testimony and evidence, if necessary.

{¶ 18} After Father rested, the magistrate heard testimony as it relates to Mother's petition for a DVCPO against Father in Case No. DV2019010065. The following is the testimony and evidence that Mother offered in support of her petition during this hearing.

<u>Mother's Testimony and Evidence in Case No. DV2019010065</u>

{¶ 19} Mother testified that Father first started physically and emotionally abusing her shortly after she moved to the United States with Father. Explaining this abuse, which Mother classified as "[b]ig abuses," Mother testified that she and Father had moved to a new house in Oxford while she was pregnant and that Father and Grandmother forced her

to "move everything." Mother also testified that Father and Grandmother forced her to clean the house by herself, which caused her to be "exposed to so much stress and work and exhaustion" that she was admitted into the hospital and placed on bed rest.

{¶ 20} Mother testified that she remained at the hospital for approximately three weeks, during which time Father treated her "badly but when he came to visit [her] at the hospital, he put on a show in front of the staff and the nurses" to give them the impression that she was "being treated well." Mother testified the abuse then continued after she was released from the hospital. This, according to Mother, included several instances where she "had to face insult and, uh, beating at home." Mother testified that Father had also headbutted her, causing her to break one of her front upper teeth, and choked her.

{¶ 21} Mother then testified regarding two specific incidents. As Mother testified, "When I was four months pregnant, I was cooking. [Father] was so upset with me and he hit me from the back and my belly hit, uh, the gas stove that I have some burning on the belly." Mother then testified, "And two months ago, he was uptight and raging against me. I was giving him his cup of tea, he held the tea kettle and hit my hand right there [leaving a scar on my left hand]." Mother also testified that Father also forbid her from working outside the home and prohibited her from driving or even leaving the house unless accompanied by either him or Grandmother.

{¶ 22} Mother further testified that Father had kept her from talking to her parents or her sisters on the phone or via Skype. Mother additionally testified that Father had locked all of her personal identification documents, her passport, and papers away in his office. As Mother testified:

> My personal identification, my passport, all my papers that had to do with me, he had them all – he had them – taken them to his office. He doesn't want me to carry any personal – any personal identification or even driver's license to, uh, allow me to carry it with me; no ID, no driver's license, nothing. As soon

as the Green Card was issued, uh, was granted, he grabbed it and locked it up. As soon as the birth certificates the babies were issued, he received them and he locked them up.

{¶ 23} Mother additionally testified regarding an incident that occurred after Grandmother helped her with the dishes the day before she fled from the house with the children. As Mother testified:

[Father] starts screaming at me. I was changing the babies' diapers and he screamed at me, "How dare you let my mother wash the dishes and you're taking care of the babies? My mother should not be working again." I did not answer him, I just went to the room. He followed me and he hit me. After that, he started insulting me and blaspheming.

{¶ 24} When asked if she ever sought medical treatment for any of the injuries Father had caused her, Mother testified, "No." This was because, according to Mother, "[Father] doesn't want anybody, uh, to know. He kept telling me to be careful and don't tell, so I didn't tell. And I cannot go by myself anywhere." Turning then to what ultimately caused Mother to leave , Mother testified:

January the 17th, the day before, he uh, hit me because his mom was washing dishes. The following day, he continued to hit me. Then he started threatening, even though he was threatening before, that he's gonna take, uh, the girls away from me. So January the 18th, it escalated so much that it gave me the feeling that he certainly is going to take, uh, the girls away from me.

{¶ 25} Continuing, Mother testified that Father had told her that he was "going to send the girls to Florida and I'm gonna send you to Jordan." Mother then testified:

The result of that, he went to work. His mom was present at home. I packed two, uh, cans of, uh, milk for the girls and diapers and all the milk bottles and got the stroller outside the window; opened the window; grabbed the first baby and put her in the stroller; went back to the second child and held her and put her in the stroller and took off – left, got out of the window quickly so she will not see me – "she" the mother-in-law – and did quickly dial 9-1-1.

{¶ 26} Mother testified that she called Father the next day to tell him that she was

with the children and that the children were safe. Mother testified that during this call Father kept telling her, "come back home and I promise – I promise, uh, nothing is gonna happen." Mother testified that Father also told her that he was "not going to harm you or hit you anymore." Mother refused to come home with the children and instead testified that she turned her phone off. Concluding, when asked if she was afraid for hers and the children's safety, Mother testified, "A lot." Mother also testified that she was concerned for the children's safety if they were ever placed with Father. This is because, according to Mother:

> I'm afraid that he might just keep them. I don't have the trust. And if something goes bad, uh, goes wrong with the girls, he's gonna say, "Well, they're in the custody of the mom, it's not my fault," he's gonna blame me."

{¶ 27} An unidentified "advocate" then testified. This advocate testified that she had observed Mother with the children at a domestic violence shelter over the preceding two weeks and found Mother to act "exceptionally well with the children," "very calm," and "engaging in age-appropriate activities for them." The advocate also testified that she had never seen Mother lose patience with the children or yell at the children, nor had she seen Mother do anything that would cause the advocate any concern about Mother's ability to care for the children. The advocate further testified that she did not have any fears based on her observations of Mother with the children that Mother would do anything to cause harm to the children. The advocate instead testified that Mother "handles herself very well, very gracefully." The advocate additionally testified that she had never seen Mother shake the children, scream at the children, or make the children kiss her hands or anything else that could be considered "bizarre."

{¶ 28} Father, having previously testified as if on cross-examination, denied that he had ever been physically, emotionally, or financially abusive towards Mother. Specifically, Father denied that he ever beat, choked, kicked, hit, burnt, or headbutted Mother. Father

also denied that he had "busted" Mother's front tooth, that he had ever yelled at Mother, pushed Mother, or threatened Mother that he would take the children away from her and send her back to Jordan. Father further denied that Mother was forbidden to leave the house without either him or Grandmother, that he had ever prohibited Mother from using her phone, that he had disconnected Mother's phone, or that he had threatened Mother that he would take the children to Florida if she ever left him. As Father testified, "I never abused her, I never hit her, I never did something bad to her." Father also testified, "No, nothing, nothing. Never touch her in a bad way." Father instead claimed that it was Mother who was "doing the bad things" to him and the children.

{¶ 29} As the matter proceeded into the late afternoon hours, the magistrate notified the parties that the hearing would be continued to allow for Father's cross-examination of Mother, re-direct examination of Mother, and the presentation of rebuttal testimony and evidence, if any. The matter was then scheduled to resume the following week on the afternoon of February 8, 2019.

## Day 2: February 8, 2019 Hearing

{¶ 30} On February 8, 2019, counsel for both parties appeared before the magistrate for the second day of the four-day hearing on Father's and Mother's reciprocal DVCPO petitions. However, rather than continuing with the presentation of evidence, counsel instead notified the magistrate that there were outstanding immigration issues that needed to be discussed before the matter could proceed any further. During this hearing, Father's counsel noted that Father was "acquiescing" to the children remaining in Mother's care until the matter could be resolved and a final decision could be made. The magistrate agreed and the matter was continued until February 21, 2019. When scheduling this hearing, the magistrate noted, "We're getting awfully close to * * * me retiring and having not a lot of time to do anything," but "[t]he goal is to continue it so that you can resolve everything."

**Day 3: February 21, 2019 Hearing**

{¶ 31} On February 21, 2019, the parties appeared before the magistrate for the third day of the four-day hearing on the reciprocal DVCPO petitions. After addressing several unrelated procedural issues, the hearing began with Father's cross-examination of Mother in Case No. DV2019010065. As part of this testimony, Mother was shown numerous photographs of her and Father smiling and looking happy together. Mother, however, testified that she was not actually happy in the photographs because Father had told her to smile when "inside" she was "so sad," "not happy," and the "feeling of the happiness was smothered." Mother also testified that Father forced her to smile in the photographs "to make the procedure of immigration easier" to make it look like they were a "normal couple, a happy couple."

{¶ 32} Continuing, Mother testified and reiterated that Father had prohibited her from leaving the house without him or Grandmother and that Father had prohibited her from working outside the home. Mother also testified that Father had forbid her from learning English. Thereafter, when asked if her tooth was already chipped when she came to the United States from Jordan so Father paid for her to have it repaired, Mother denied that allegation and testified, "Of course he need to cover up what he did to my face * * *. It's natural reaction for husband to hide his action." Mother additionally testified that Father had threatened to have Grandmother and Brother "witness against" her that she was "bad" and "not okay."

{¶ 33} Mother testified that Father had also "forced" her "to work hard in the house and was forced to be tired" when she was pregnant with the children, which Mother testified was ultimately why she was admitted into the hospital and placed on bedrest. As Mother testified, "I was humiliated; I was beaten up if I wanted to rest." Then, when asked why she stayed with Father as long as she did rather than telling someone at the hospital that she

did not want to go home, Mother testified that Father was threatening her "twenty-four on twenty-four." Mother also testified that she was "a foreigner" who was at that time pregnant, "weak," and "didn't know what to do here." Mother then testified that, "Unfortunately, I didn't know anything," "didn't know that I have rights," "didn't know that I could, uh – if I knew how strong I can be and I have right to claim them, from the very beginning I would – I would [have] done it from the very beginning * * *."

{¶ 34} Mother then testified that she "took a decision my own way" in order to protect the children and herself from Father. Mother also testified that she was "humiliated" by the violence and "living in fear" of Father. However, although fearful of Father and what he might do to her and the children, Mother testified that she was trying her best to fix "the atmosphere," but that she was "feeling that he – I couldn't take it anymore." Mother also testified that she was "under the pressure" and believed that Father would "stop beating" her after she gave birth to the children. However, when the beating did not stop even after the children were born, Mother testified that "at the end [she] had to run away from the suppression and oppression."

{¶ 35} Following Mother's testimony on cross-examination, Father called his and Mother's former neighbor, J.A., as a rebuttal witness. J.A. testified that she lived across the street from Father and Mother for approximately five months. During this time, J.A. testified that she had seen Mother outside alone and would socialize with Mother at times when Mother was unaccompanied by either Father or Grandmother. J.A. also testified that Mother had come to her house alone approximately four or five times and that she had never noticed any issues between Father and Mother that would make her think Mother was being abused. J.A. additionally testified that she had never seen Father hit, scream at, bully, or act in any way violent towards Mother. J.A. instead testified that she thought Father and Mother were a "darling young couple, full of promise and excitement for [Mother] to join

our society and be part of, uh, America and part of [Father's] life."

{¶ 36} Following J.A.'s testimony, Father notified the magistrate that he would also be calling Grandmother to testify as a rebuttal witness. To this, the magistrate notified the parties that the hearing would need to be continued again to avoid going late into the evening hours. The parties then went about picking a date to reconvene, during which the magistrate stated, "Well we all know the elephant in the room is that I'm retiring at the end of March so we need to get this done so I have some time –" Thereafter, when none of the proposed dates proved suitable for the parties, the magistrate stated :

> Well then we might be done. We might just be – done then, because I'm not gonna – I mean, I'll just have to call this hearing complete and we're done because I – I'm – I'm not gonna go out any further than that and * * * I'm trying to find a date and nobody can – can work with me and so if we can't find a date, I'll make a decision on this * * * so one of you will be able to object and then you can start all over again with the Judge and just do it again.

The parties then agreed to continue the matter to the afternoon of March 5, 2019.

### Day 4: March 5, 2019 Hearing

{¶ 37} On March 5, 2019, Mother, her counsel, and Father's counsel appeared for the fourth and final day of the four-day hearing. Opening the hearing, Father's counsel moved for a continuance. Father's counsel supported this motion by alleging Father had become "physically ill" and was not able to attend the hearing and testify on rebuttal. Mother's counsel objected to any further continuance by noting that there was nothing that prevented Father's counsel from presenting "some kind of evidence even without her client," such as rebuttal testimony from Grandmother.

{¶ 38} Agreeing with Mother's counsel, the magistrate denied Father's counsel's motion for a continuance. In so holding, the magistrate noted that it was going to "allow the case to go forward today with regard to [Grandmother] * * * because she can testify today

as the rebuttal witnesses." To this, Father's counsel responded, "Your Honor, we have no witnesses for today. [Grandmother] did not make an appearance today. We have no witnesses for today." Father's counsel then stated, "It was my intent to call [Grandmother] as a rebuttal witness, but since my client is ill, she did not – I did not reach out to [Grandmother] to also appear today." The magistrate then replied and stated:

> Yes, well that's unfortunate. Because, just so the record reflects this, uh, this magistrate is retiring at the end of this month so we don't have the luxury of time here. Ordinarily, if an a – an attorney such as [Father's counsel] or [Mother's counsel] comes into my Courtroom and as an officer of the Court represents that there's an illness, um, I'm gonna take 'em for their word and that's what I'm doing here today, um, I would grant the one – continuance, but we're really up against time and if I remember correctly last time we had some difficulty scheduling this hearing today.

{¶ 39} After some further discussion, Father's counsel notified the magistrate that Father "had wanted to, obviously" testify in rebuttal, but that there was nevertheless "sufficient evidence to make a decision in this case." There is no dispute that Father did not proffer anything on the record as to what he might have testified to on rebuttal had he been able to attend the hearing.

{¶ 40} Upon learning that neither Father nor Mother were going to present any additional testimony or evidence, the magistrate took a brief recess to consult its notes and review the exhibits. The magistrate then returned to the bench and issued its decision denying Father's petition for a DVCPO against Mother in Case No. DV2019010051 and granting Mother's petition for a DVCPO against Father in Case No. DV2019010065. The magistrate then issued two separate entries setting forth its decision as it relates to each of those two cases. Finding no error of law or other defect evident on the face of either of those two entries, the domestic relations court adopted the magistrate's decision in both cases later that day.

{¶ 41} On March 13, 2019, Father filed an objection to the magistrate's decision denying his petition for a DVCPO against Mother in Case No. DV2019010051. Father supported his objection by arguing the magistrate's decision was against the manifest weight of the evidence and otherwise "contrary to law." Father also argued that "the factual evidence presented at trial does support a finding of domestic violence." Father did not file any objection to the magistrate's decision granting Mother's petition for a DVCPO against him in Case No. DV2019010065.

{¶ 42} On March 25, 2019, Father filed a motion requesting findings of fact and conclusions of law regarding the magistrate's March 5, 2019 decision. The magistrate denied Father's motion on April 1, 2019. The domestic relations court thereafter affirmed and adopted the magistrate's decision denying Father's motion for findings of fact and conclusions of law on June 12, 2019. In so holding, the domestic relations court noted that the civil rules "obviate[] the need for a finding of fact from the magistrate when the magistrate conducts the final hearing on a DVCPO. Thus, the Magistrate properly denied [Father's] request for [findings of fact and conclusions of law]. "

{¶ 43} On October 10, 2019, the domestic relations court issued a decision denying Father's objection to the magistrate's decision.[2] In so holding, the domestic relations court found Father had not provided any "credible evidence" regarding "violence on the part of [Mother] towards him." The domestic relations court also found Father had not provided any corroborating evidence, "such as pediatric records, police reports, or Children Services involvement," to support his claims "regarding neglect/abuse on the part of [Mother] toward the minor children," nor had Father expressed any "concerns regarding [Mother's] parenting

---

2. We note that Father obtained new counsel on June 7, 2019, which was approximately two months after his original counsel filed his objection to the magistrate's decision and his motion for findings of fact and conclusions of law.

of the children until [after] she left the home." The domestic relations court instead found credible the testimony from Sergeant Price, as well as the testimony from the unidentified "advocate," that Mother "was appropriate with and caring toward the children, no testimony was provided that the children exhibited any signs of stress, neglect, or abuse."

{¶ 44} Father now appeals, raising six assignments of error for review.

{¶ 45} Assignment of Error No. 1:

{¶ 46} THE TRIAL COURT ERRED IN DISMISSING FATHER'S PETITON FOR DVCPO WHEN IT DENIED A CONTINUANCE DUE TO FATHER'S ILLNESS THEREBY DEPRIVING HIM OF DUE PROCESS AND THE OPPORTUNITY TO PRESENT REBUTTAL TESTIMONY.

{¶ 47} In his first assignment of error, Father argues the magistrate erred by denying his counsel's motion for a continuance when he became physically ill and could not appear at the March 5, 2019 hearing. We disagree.

{¶ 48} The grant or denial of motion for a continuance is a matter to be entrusted to the broad and sound discretion of the domestic relations court. *Black v. Black*, 12th Dist. Clinton No. CA2008-06-022, 2009-Ohio-92, ¶ 11; *Garrett v. Garrett*, 12th Dist. Madison No. CA2015-09-024, 2016-Ohio-262, ¶ 42. Absent an abuse of that discretion, this court will not disturb the domestic relations court's decision to deny a motion for a continuance. *Haynes v. Haynes*, 12th Dist. Clermont No. CA2008-01-003, 2008-Ohio-4963, ¶ 7; *Denier v. Carnes-Denier*, 12th Dist. Warren Nos. CA2016-02-012 and CA2016-04-022, 2017-Ohio-334, ¶ 49. "An abuse of discretion means more than an error of judgment; it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable." *Sparks v. Sparks*, 12th Dist. Warren No. CA2015-10-095, 2016-Ohio-2896, ¶ 7, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 49} In determining whether the domestic relations court abused its discretion in

denying a motion for a continuance, this court should consider "(1) the length of the delay requested; (2) whether other continuances have been requested and received; (3) the inconvenience to witnesses, opposing counsel, and the court; (4) whether there is a legitimate reason for the continuance; (5) whether the defendant contributed to the circumstances giving rise to the need for the continuance, and (6) other relevant factors, depending on the unique facts of each case." *Caramico v. Caramico*, 12th Dist. Clermont No. CA2015-03-025, 2015-Ohio-4232, ¶ 10, citing *Black* at ¶ 12; and *Kirkpatrick v. Kirkpatrick*, 5th Dist. Tuscarawas No. 2014AP050018, 2015-Ohio-427, ¶ 22. These factors are used to ensure the domestic relations court "balances its interest in controlling its own docket and the public's interest in an efficient judicial system with the possibility of prejudice to the parties." *Jones v. Wall*, 12th Dist. Warren No. CA2015-10-088, 2016-Ohio-2780, ¶ 37, citing *Tener v. Tener-Tucker*, 12th Dist. Warren No. CA2004-05-061, 2005-Ohio-3892, ¶ 42.

{¶ 50} Father argues his right to due process was violated when the magistrate denied his counsel's motion for a continuance after he became physically ill and was unable to appear at the March 5, 2019 hearing. This is because, according to Father, the domestic relations court's decision violated his right to due process in that it deprived him of the opportunity to testify on rebuttal. Father supports this claim by noting the magistrate's comments regarding its pending retirement when denying his counsel's motion. Specifically, as the magistrate stated when denying the motion:

> [T]his magistrate is retiring at the end of this month so we don't have the luxury of time here. Ordinarily, if an a–an attorney such as [Father's counsel or Mother's counsel] comes into my Courtroom and as an officer of the Court represents that there's an illness, um, I'm gonna take 'em for their word and that's what I'm doing here today, um, and I would grant the – one continuance, but we're really up against time and if I remember correctly last time we had some difficulty scheduling this hearing today.

{¶ 51} A domestic relations court has the "inherent power to control its own docket and the progress of the proceedings in its own court." *Tekamp v. Tekamp*, 12th Dist. Warren No. CA2018-08-092, 2019-Ohio-2382, ¶ 26, citing *Kranz v. Kranz*, 12th Dist. Warren No. CA2012-05-038, 2013-Ohio-1113, ¶ 17. However, when considering the magistrate acknowledged that it would have ordinarily granted counsel's motion for a continuance under these circumstances, we are troubled by the magistrate's decision to deny Father's motion for a continuance in this case. This is because, in most instances, a magistrate's impending retirement would not serve as a sufficient basis upon which to deny a motion for a continuance due to illness. However, be that as it may, the record is clear that Father never proffered anything on the record to demonstrate how the magistrate's decision to deny his counsel's motion for a continuance subjected him to any resulting prejudice.

{¶ 52} "In the absence of a proffer of testimony, we cannot determine whether [Father's] testimony would likely have affected the outcome of this case." *Folck v. Patton*, 2d Dist. Clark No. 2013-CA-105, 2014-Ohio-2304, ¶ 32, citing *Harrison v. Penn Traffic Co.*, 10th Dist. Franklin No. 04AP-728, 2005-Ohio-638, ¶ 24; *see, e.g., Caceres v. Caceres*, 3d Dist. Marion No. 9-04-60, 2005-Ohio-1915, ¶ 8 (trial court did not err by denying appellant's motion for a continuance when three of his "subpoenaed witnesses did not appear" since appellant "did not proffer the testimony of the absent witnesses, so no determination of prejudice can be made"). This is particularly true here when considering the magistrate had already heard testimony from one rebuttal witness, J.A., at the February 21, 2019 hearing, as well as testimony from Father on both direct examination and cross-examination at the February 1, 2019 hearing. That is to say nothing of the fact that Father's counsel specifically acknowledged that there already was "sufficient evidence to make a decision in this case"

even without Father's testimony on rebuttal. Therefore, because Father has not demonstrated that he suffered any resulting prejudice by the trial court's decision to deny his counsel's motion for a continuance, Father's first assignment of error is overruled.

{¶ 53} Assignment of Error No. 2:

{¶ 54} THE TRIAL COURT ERRED IN GRANTING MOTHER'S PETITION FOR DVCPO WHERE EVIDENCE WAS INSUFFICIENT AND THE FINDING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 55} In his second assignment of error, Father argues the domestic relations court erred by granting Mother's petition for a DVCPO against him in Case No. DV2019010065. However, as noted above, while Father filed objections to the domestic relations court's order adopting the magistrate's decision denying his petition for a DVCPO against Mother in Case No. DV19010051, Father did not file any objections to the domestic relations court's order adopting the magistrate's decision granting Mother's petition for a DVCPO against him in Case No DV19010065.[3]

{¶ 56} Pursuant to Civ.R. 65.1(G), a party must timely file objections prior to filing an appeal.[4] *McVean v. McVean*, 12th Dist. Butler No. CA2018-03-054, 2018-Ohio-4062, ¶ 17; *Tilbrook v. Francis*, 12th Dist. Warren No. CA2017-06-091, 2018-Ohio-4064, ¶ 16; *Pinkston v. White*, 12th Dist. Butler No. CA2019-06-094, 2019-Ohio-5165, ¶ 12; *White v. Ferrell*, 12th Dist. Madison No. CA2018-06-016, 2020-Ohio-970, ¶ 12 ("[p]rior to filing an appeal, a party must timely file objections to a court's adoption of a magistrate's denial or granting of a

3. The domestic relations court specifically noted this fact as part of its decision overruling Father's objection to the magistrate's decision. As noted by the domestic relations court, "[Father] also appears to object to the granting of a cross Petition filed by [Mother] against [Father] in another case; however, the Court has no record of an Objection filed by either party in that case."

4. We note that Civ.R. 65.1(G) was amended effective July 1, 2016 to require "that a party must file objections prior to filing an appeal from a trial court's otherwise appealable adoption, modification, or rejection of a magistrate's ruling." 2016 Staff Note to Civ.R. 65.1. This court's decision in *Wulf v. Opp*, 12th Dist. Clermont No. CA2014-10-074, 2015-Ohio-3285, ¶ 17 finding "the filing of objections with the trial court is not mandatory" under Civ.R. 65.1 was issued prior to the effective date of that amendment.

protection order" as required by Civ.R. 65.1[G]). Specifically, as Civ.R. 65.1(G) provides:

> Notwithstanding the provisions of any other rule, an order entered by the court under division (F)(3)(c) or division (F)(3)(e) of this rule is a final, appealable order. However, *a party must timely file objections to such an order under division (F)(3)(d) of this rule prior to filing an appeal*, and the timely filing of such objections shall stay the running of the time for appeal until the filing of the court's ruling on the objections.

(Emphasis added.)

{¶ 57} This requirement is grounded in two key principles: (1) to promote the fair administration of justice, including affording the domestic relations court an opportunity to review the transcript and address any insufficiency of evidence or abuse of discretion that would render the order or a term of the order unjust; and (2) to create a more robust record upon which the appeal may proceed. 2016 Staff Note to Civ.R. 65.1. Therefore, because Civ.R. 65.1(G) requires a party to timely file objections prior to filing an appeal under these circumstances, Father is not permitted to appeal the domestic relations court's order adopting the magistrate's decision granting Mother's petition for a DVCPO against him, nor any of the terms thereof. *See, e.g., Becker v. Harnar*, 12th Dist. Warren No. CA2019-06-064, 2020-Ohio-3234, ¶ 12 (respondent was not permitted to appeal the trial court's order adopting a magistrate's decision granting a civil stalking protection order against him where respondent did not file objections to the trial court's order as required by Civ.R. 65.1[G]); *Danison v. Blinco*, 3d Dist. Crawford No. 3-18-19, 2019-Ohio-2767, ¶ 8 ("parties wishing to object to the trial court's adoption of the magistrate's decision must timely file objections with the trial court [in accordance with Civ.R. 65.1(G)] as failure to do so waives their arguments regarding the trial court's adoption of the magistrate's decision"). Accordingly, Father's second assignment of error is overruled.

{¶ 58} Assignment of Error No. 3:

{¶ 59} THE TRIAL COURT ERRED IN INCLUDING THE MINOR CHILDREN AS

- 21 -

PROTECTED PERSONS IN THE DVCPO WHEN MOTHER DID NOT REQUEST TO INCLUDE THEM IN HER PETITION.

{¶ 60} In his third assignment of error, Father argues the domestic relations court erred by naming the parties' two minor children as protected persons in the DVCPO it granted to Mother. However, in light of our decision under Father's second assignment of error, Father is not permitted to appeal this issue. This is because, as noted above, Father failed, as required by Civ.R. 65.1(G), to file any objections to the domestic relations court's order adopting the magistrate's decision granting Mother's petition for a DVCPO. That is to say, without filing timely objections in the domestic relations court as required by Civ.R. 65.1(G), Father is not permitted to appeal the domestic relations court's order adopting the magistrate's decision granting Mother's petition for a DVCPO against him. *See, e.g., Anderson v. Gregory*, 2d Dist. Montgomery No. 28277, 2019-Ohio-2346, ¶ 6-9 (appellant was not permitted to appeal the trial court's order adopting the magistrate's decision granting appellee a civil stalking protection order against her where appellant failed to file objections to the trial court's decision as required by Civ.R. 65.1[G]). Therefore, for the same reasons outlined above in our decision overruling Father's second assignment of error, Father's third assignment of error is overruled.[5]

{¶ 61} Assignment of Error No. 4:

{¶ 62} THE TRIAL COURT ERRED IN ADMITTING POLICE REPORTS (EXHIBIT 2) WITHOUT PROPER AUTHENTICATION.

{¶ 63} In his fourth assignment of error, Father argues the domestic relations court erred by admitting into evidence Exhibit 2, a police report that Mother offered in support of

---

5. We note that even if Father was permitted to appeal this issue, the record is clear that neither child was named as a protected person in the DVCPO the domestic relations court granted to Mother. It is Mother, and Mother alone, who is named as a protected person in the DVCPO. Father's claim otherwise is simply incorrect.

her petition for a DVCPO, since the police report was not properly authenticated by Sergeant Price. However, in light of our decision under Father's second and third assignments of error, Father is also not permitted to appeal this issue. This is because, as noted above, Father failed to file any objections to the domestic relations court's order adopting the magistrate's decision granting Mother's petition for a DVCPO against him as required by Civ.R. 65.1(G). Therefore, for the same reasons outlined above in our decision overruling both Father's second and third assignments of error, Father's fourth assignment of error likewise lacks merit and is overruled.

{¶ 64} Assignment of Error No. 5:

{¶ 65} THE TRIAL COURT ERRED IN DENYING FATHER'S PETITION FOR DVCPO.

{¶ 66} In his fifth assignment of error, Father argues the domestic relations court erred by denying his petition for a DVCPO against Mother in Case No. DV19010051. We disagree.

{¶ 67} A petition for a DVCPO is governed by R.C. 3113.31. *Crawford v. Brandon*, 12th Dist. Butler Nos. CA2013-08-150 and CA2013-08-151, 2014-Ohio-3659, ¶ 6, citing *Wolfe v. Wolfe*, 5th Dist. Stark No. 2013CA00196, 2014-Ohio-2159, ¶ 7. Pursuant to that statute, to obtain a DVCPO the petitioner must prove by a preponderance of the evidence that the respondent has engaged in an act of "domestic violence" against the petitioner or petitioner's family or household members. *McBride v. McBride*, 12th Dist. Butler No. CA2011-03-061, 2012-Ohio-2146, ¶ 12, citing *Felton v. Felton*, 79 Ohio St.3d 34 (1997), paragraph two of the syllabus. "Preponderance of the evidence" means the greater weight of the evidence, or evidence that leads the trier of fact to find that the existence of the contested fact is more probable than its nonexistence. *Halcomb v. Greenwood*, 12th Dist. Clermont Nos. CA2018-03-008, CA2018-03-010, CA2018-03-012, and CA2018-03-013,

2019-Ohio-194, ¶ 3, citing *Eckstein v. Colian*, 7th Dist. Columbiana No. 11 CO 22, 2012-Ohio-4038, ¶ 14.

{¶ 68} As relevant here, R.C. 3113.31(A)(1)(a)(i) thru (iii) defines the phrase "domestic violence" to include the occurrence of one or more of the following acts against a family or household member:

> (i) Attempting to cause or recklessly causing bodily injury;
>
> (ii) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 or 2911.211 of the Revised Code;
>
> (iii) Committing any act with respect to a child that would result in the child being an abused child, as defined in section 2151.031 of the Revised Code;
>
> (iv) Committing a sexually oriented offense.

A "spouse" who is residing with or has resided with the respondent is a "family or household member" under R.C. 3113.31(A)(3)(a)(i). A "child of the respondent" is also considered a "family or household member" under R.C. 3113.31(A)(3)(a)(ii).

{¶ 69} "A trial court's decision to grant or deny a DVCPO will not be reversed where such decision is supported by the manifest weight of the evidence." *Barrett v. Barrett*, 12th Dist. Warren No. CA2016-04-033, 2017-Ohio-250, ¶ 19. The standard of review for a manifest weight challenge in a civil case is the same as that applied to a criminal case. *Dunn v. Clark*, 12th Dist. Warren No. CA2015-06-055, 2016-Ohio-641, ¶ 8, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 17. In considering a manifest weight challenge, a reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created a manifest miscarriage of justice warranting reversal and a new trial ordered. *Hacker v. House*, 12th Dist. Butler No. CA2014-11-230, 2015-Ohio-4741, ¶ 21, citing *Eastley* at ¶ 20. "A judgment will not be reversed as being

- 24 -

against the manifest weight of the evidence where the judgment is supported by some competent, credible evidence going to all essential elements of the case." *McGrady v. Muench*, 12th Dist. Warren No. CA2018-12-145, 2019-Ohio-2677, ¶ 14, citing *Sterling Constr., Inc. v. Alkire*, 12th Dist. Madison No. CA2016-12-032, 2017-Ohio-7213, ¶ 8.

{¶ 70} Father argues the domestic relations court erred by denying his petition for a DVCPO against Mother when considering he testified that, based on his observations, he believed Mother was unable to care for the children on her own. Father also argues the domestic relations court erred by denying his petition since he testified that he had witnessed Mother "screaming and shaking" the children, as well as threaten to remove the children from the United States and take them back to Jordan. This was in addition to Father's testimony that Mother had failed to take the children to a doctor's appointment to receive their four-month immunization shots.

{¶ 71} However, as noted above, the domestic relations court found Father's testimony lacked credibility. This is because, as the domestic relations court found, Father did not provide any corroborating evidence, "such as pediatric records, police reports, or Children Services involvement," to support his claims "regarding neglect/abuse on the part of [Mother] toward the minor children." The domestic relations court also found Father had not expressed any "concerns regarding [Mother's] parenting of the children until [after] she left the home." The domestic relations court instead found credible the testimony from Sergeant Price and the unidentified "advocate," both of whom testified regarding their observations of Mother with the children after fleeing with the children on January 18, 2019.

{¶ 72} We find no error in the domestic relations court's decision. In so holding, we note that Father is essentially arguing that the domestic relations court acted improperly by finding his testimony lacked credibility. However, "it is well-established that a trial court, particularly a domestic relations court, is in the best position to assess the credibility of

witnesses and the weight to be given to their testimony." *Halcomb v. Greenwood*, 2019-Ohio-194 at ¶ 40. Therefore, because the domestic relations court was best suited to assess the credibility and the weight to be given to the witnesses' testimony, this court should not, and will not, substitute our judgment for that of the domestic relations court. *McGrady v. Muench*, 12th Dist. Warren No. CA2018-12-145, 2019-Ohio-2677, ¶ 15. It is not the role of this court to substitute its own determination of credibility in place of the domestic relations court. *Brandon*, 2014-Ohio-3659 at ¶ 15. Accordingly, finding no error in the domestic relations court's decision to deny Father's motion for a DVCPO against Mother in Case No. DV19010051, Father's fifth assignment of error is overruled.

{¶ 73} Assignment of Error No. 6:

{¶ 74} THE TRIAL COURT ERRED IN FAILING TO ISSUE FINDINGS OF FACT AND CONCLUSIONS OF LAW.

{¶ 75} In his sixth assignment of error, Father argues the trial court erred by denying his motion requesting findings of fact and conclusions of law. We disagree.

{¶ 76} Pursuant to Civ.R. 65.1(F)(3)(b), a magistrate's decision denying a petitioner's request for a DVCPO against the respondent "after full hearing under this division does not constitute a magistrate's order or a magistrate's decision under Civ.R. 53(D)(2) or (3) and is not subject to the requirements of those rules." "This includes the request for findings of fact and conclusions of law as provided by Civ.R. 53(D)(3)(a)(ii)." *Wulf v. Opp*, 12th Dist. Clermont No. CA2014-10-074, 2015-Ohio-3285, ¶ 16; *Insa v. Insa*, 2d Dist. Montgomery No. 26909, 2016-Ohio-7425, ¶ 27 ("Civ.R. 65.1, unlike Civ.R. 53, does not provide for a request for findings of fact and conclusions of law"). This is because, as noted by the Eighth District Court of Appeals, "it would be *inconsistent* with Civ.R. 65.1 to allow a request for findings of fact and conclusions of law because it would delay the proceedings." (Emphasis sic.) *Besman v. Leventhal*, 8th Dist. Cuyahoga No. 104414, 2017-Ohio-464, ¶ 5,

discretionary appeal not allowed, 151 Ohio St.3d 1503, 2018-Ohio-365. There is in fact nothing in the text of Civ.R. 65.1 that permits a party to move for findings of fact and conclusions of law. *Id.* (finding false a claim that "nothing in the text of Civ.R. 65.1 prohibits a party from filing a motion requesting findings of fact and conclusions of law").

{¶ 77} Father claims this constitutes a custody modification and should be governed by the rules relating to change of custody proceedings brought under R.C. 3109.04. However, while it may be true that the Ohio Supreme Court has held that "Civ.R. 52, requiring separate findings of fact and conclusions of law upon timely request, applies to change of custody proceedings," *Werden v. Crawford*, 70 Ohio St.2d 122, 124 (1982), the temporary allocation of parental rights in a "protection-order proceeding" is not regarded as a "custody proceeding" that is subject to the requirements set forth in Civ.R. 52. *Insa* at ¶ 35 ("a temporary allocation of parental rights in a protection-order proceeding falls outside the scope of R.C. 3109.04 because such a proceeding is not a custody proceeding under that statute"). The Ohio Supreme Court has in fact "expressly rejected" the argument that a reference in R.C. 3109.04 "to the allocation of parental rights 'in any proceeding' included the temporary allocation of such rights in a protection-order proceeding." *Id.* at ¶ 36, citing *State ex rel. Thompson v. Spon*, 83 Ohio St.3d 551 (1998). Therefore, finding no merit to any of the arguments raised by Father herein, Father's sixth assignment of error is overruled.

{¶ 78} Judgment affirmed.

HENDRICKSON, P.J., and PIPER, J., concur.